### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### EL DORADO DIVISION

JOHN D. KENNEDY                                    **PLAINTIFF**

　　　v.　　　　　　　**Case No. 08-CV-1034**

SUN LIFE ASSURANCE COMPANY OF CANADA                **DEFENDANT**

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging Defendant wrongly denied his claim for long term disability benefits and waiver of life insurance premiums under the El Dorado Chemical Company Employee Group Benefits Plan issued by Defendant. Before the Court are the Administrative Record (Doc. 6), Plaintiff's Brief (Doc. 16), and Defendant's Brief (Doc. 22). For the reasons stated herein, the Court finds that Defendant's decision to deny benefits was not supported by substantial evidence. Therefore, Plaintiff's claims for long term disability benefits and a waiver of premiums on life insurance benefits are **GRANTED.** Plaintiff's claim for attorney's fees and costs is also **GRANTED.**

## I. Background

### A.  <u>Plaintiff's Stroke</u>

Plaintiff was employed by the El Dorado Chemical Company as a Chemical Facility Maintenance Supervisor. On August 22, 2005, Plaintiff suffered an apparent stroke. Plaintiff was at home

washing his car when he began to feel nauseated and tired. He went into his house to rest. SL 0189. The following day, Plaintiff reported for work in the morning and shared a morning beverage with his co-workers. At that point, a co-worker asked Plaintiff what was wrong and pointed out that Plaintiff was spilling his drink. Plaintiff realized that the right side of his face was numb. He was taken to the emergency room of the Medical Center of South Arkansas in El Dorado. *Id.* When Plaintiff presented at the hospital, he complained of numbness of the right arm and leg, dysphagia (trouble swallowing), vertigo (dizziness), and hypertension (high blood pressure). SL 0152. The attending physician at the hospital, Dr. Richard Davis, noted Plaintiff displayed "numbness with lack of temperature sensation in the right arm and leg," and that Plaintiff had received a cardiac stent in the past due to unstable angina and a history of hypertension. SL 0153.

Plaintiff was admitted to the hospital and treated for hypertension and stroke. The CT scan administered to Plaintiff revealed no hemorrhage. He was administered the drugs Plavix and aspirin and underwent an MRI and an MRA, which showed a "very small lacunar infarct."[1] SL 0154. The MRI and MRA results showed a

---

[1] According to http://en.wikipedia.org/wiki/Lacunar_stroke, a lacunar infarct "is a type of stroke that results from occlusion of one of the penetrating arteries that provides blood to the brain's deep structures."

2

"mild to moderate frontal and convexity cortical cerebral atrophy," as well as "...a 1 cm sphere of bright signal" and "...[s]mall bright T2...in the left frontal white matter." SL 0163.  While in the hospital, on August 25, 2005, Plaintiff underwent a swallowing test, which concluded that Plaintiff had "[m]arked weakness of that part of the swallowing that entails elevation of the larynx.  The proximal esophagus remained opened through this study as evidence of weakness of the sphincter." SL 0159.

Plaintiff saw a neurologist during his stay in the hospital, Dr. Ghulam Khaleel, who noted decreased sensory modalities in the right upper extremity and an unsteady gait due to right lower extremity weakness.  Dr. Khaleel noted the MRI and MRA looked essentially normal, except for a small right frontal lacunar infarct.  Dr. Khaleel concluded Plaintiff had reversible ischemic neurological deficit (RIND), which is a type of infarction (stroke) of limited duration, usually 24-72 hours.  *See* http://en.wikipedia.org/wiki/Transient_ischemic_attack.

When Plaintiff was discharged from the hospital on August 25, 2005, Dr. Davis diagnosed him as having had a "cerebrovascular accident" or CVA (stroke).  SL 0169.  Plaintiff was advised by Dr. Davis not to return to work "at present."  *Id.*  At the time of discharge, Dr. Davis noted that Plaintiff still had "mild dysphagia" and "persistent numbness" in his right arm or right leg, but otherwise "no neurological deficits."  SL 0154.

3

The administrative record in this case reflects that Plaintiff returned to Dr. Davis for follow-up examinations approximately every two weeks following discharge from the hospital until February 14, 2006. SL 0142-0151. Thereafter, he saw Dr. Davis on March 28, 2006. SL 0217. Plaintiff was also seen in follow-up by Dr. Khaleel "on a regular basis, at least two times a month," according to a letter Dr. Khaleel wrote on September 1, 2006. SL 0025. The record contains notes from Dr. Khaleel's physical examinations of Plaintiff on September 28, 2005 and July 10, 2006. SL 0284.

B.   **Medical Reports by Dr. Davis**

A cursory examination of the follow-up reports of Plaintiff's treating physician, Dr. Davis, reveals that Plaintiff continued to be treated for essentially the same symptoms he had while in the hospital. There is no evidence in the record that Plaintiff's symptoms normalized or disappeared during the year following Plaintiff's stroke.

During Plaintiff's examination by Dr. Davis on August 31, 2005, Dr. Davis wrote on the chart "dysphagia" and "dizziness"; on September 14, 2005, a follow-up examination with Dr. Davis for "HTN [hypertension] + CVA [stroke]" revealed that Plaintiff's blood pressure was 150/96, which is in the hypertensive range; during Plaintiff's check-up on September 24, 2005, the diagnosis continued to be "CVA"; on October 25, 2005, Dr. Davis noted Plaintiff's blood

4

pressure was 162/108 and that Plaintiff was "still numb R[ight] hand and leg"; in November, Plaintiff had another "follow up CVA" and continued to have uncontrolled high blood pressure of 150/100, despite taking prescribed medications; the examination on December 14, 2005, revealed continuing "HTN [hypertension]" "fingers + nails split on ends" and "dizziness"; Plaintiff's symptoms were no better on December 27, 2005, with continued high blood pressure readings of 180/120 and "dizziness"; on January 10, 2006, Plaintiff's blood pressure was 160/102, and under the "neurological" section of the chart, Dr. Davis noted "no change"; on January 24, 2006, Plaintiff's hypertension was still uncontrolled at 150/100, but Dr. Davis noted nothing further on the chart; finally, on February 14, 2006, Dr. Davis wrote down the names of the various medications prescribed for Plaintiff's hypertension, high cholesterol, and depression, and recorded his blood pressure at 134/80, which is the lowest it had been since the stroke.  SL 0145-0151.

The last physical examination of Plaintiff by Dr. Davis in the record occurred on March 28, 2006, when Dr. Davis noted a normal blood pressure standing of 110/70, and a pre-hypertensive pressure lying down of 130/80[2].  SL 0217.  Dr. Davis wrote on the chart that

_____

[2]

The National Heart Lung and Blood Pressure Institute of the National Institutes of Health reports the following ranges for normal and high blood pressure readings in adults: normal is less than 120/80; pre-hypertension range is 120-139/80-89; stage 1 hypertension range is 140-159/90-99; and stage 2 hypertension is greater than 160/100.
http://www.nhlbi.nih.gov/hbp/detect/categ.htm.

Plaintiff was still "dizzy a lot" and jotted down the words "dizziness" "CVA" and "hypertension." *Id.*

In a June 7, 2006 letter addressed to "To Whom It May Concern" and considered by Defendant in evaluating Plaintiff's claim for benefits, Dr. Davis opined:

> "[Plaintiff's] rehabilitation from the stroke has been complicated by recurrent vertigo and disequilibrium. This has been a significant problem with quick head movements and quick changes of position of his body. At times, he has had episodic periods of a disequilibrium to where he has felt as if he was going to fall. He has actually had some episodes of falling since the stroke. This has been recurrent. It has not improved." SL 0051.

As detailed above, Dr. Davis reported on Plaintiff's continued complaints of dizziness during the six-month follow-up period after Plaintiff's initial hospitalization for stroke. In the June 7 letter, Dr. Davis concluded:

> "[Dizziness] keeps [Plaintiff] from being able to safely operate dangerous equipment. It keeps him from being able to climb, and it keeps him from being able to drive at times. For this reason, I feel that he should not work in an area where dangerous equipment or dangerous materials exist. He should not work in an area where he would be required to climb." *Id.*

6

Dr. Davis also determined that, due to Plaintiff's continued symptoms of weakness in his lower extremity, "the maximum distance that he can walk is approximately 200 feet." *Id.*

C.   **Medical Reports by Dr. Khaleel**

Dr. Khaleel is the neurologist who examined Plaintiff in the hospital after his stroke in August of 2005. Dr. Khaleel's notes from his examination on August 24, 2005, stated that an "old infarct in the R[ight] Frontal Lobe area has been consulted for tingling, numbness & weakness on RUE/RLE [Right Upper Extremity/Right Lower Extremity] that seems to have now stabilized after initial progression over the last several days." SL 0285. He also noted that Plaintiff "had difficulty in balancing especially in the R[ight] foot." Dr. Khaleel found that Plaintiff complained of "food choking & swallowing difficulty." He evaluated the Plaintiff's right and left upper and lower extremities as to range of motion, and scored them "5/5"; however, in the next line of the chart, the doctor noted Plaintiff's "[u]nsteady gait due to RLE [Right Lower Extremity] weakness" and that Plaintiff "had some difficulty in performing tandem gait, ↓ [decreased] sensory modalities on RUE [Right Upper Extremity]." *Id.*

Dr. Khaleel's diagnosis in the hospital was that Plaintiff suffered a stroke, in particular, a Reversible Ischemic Neuro

7

Deficit (RIND).[3]  *Id.*  In his follow-up examination with Dr. Khaleel on September 28, 2005, Plaintiff's neurological functions were described as "stable," but Dr. Khaleel noted that Plaintiff still had difficulty with "swallowing and R[ight] sided sensory symptoms..." SL 0284  These symptoms had not disappeared in July 2006, nearly ten months later, as Dr. Khaleel noted again Plaintiff's "R[ight] sided weakness" and "↓ [decreased] sensory modalities in a glove distribution on RUE [Right Upper Extremity]."

Dr. Khaleel wrote a letter on September 1, 2006, summarizing his observations of Plaintiff's neurological condition.  SL 0025. Dr. Khaleel stated that Plaintiff had an MRI on August 9, 2006, which "continued to show right frontal deep white matter that could have infarcted along with mild central and moderate cortical atrophy in a symmetric cerebral involvement."  He also noted that Plaintiff "could not retain his balance and this makes him very upset and nervous..."  SL 0025.

---

[3]

        An ischemic stroke, like the one Plaintiff had, occurs when an artery that supplies oxygen-rich blood to the brain becomes blocked.  "Ischemia" is defined by Dorland's Illustrated Medical Dictionary 681 (26th ed. 1985), as a "deficiency of blood in a part, due to functional constriction or actual obstruction of a blood vessel."  High blood pressure is generally not the cause of an ischemic stroke; rather, high blood pressure is often the cause of a hemorrhagic stroke, which occurs when an artery in the brain leaks blood or ruptures.
http://www.nhlbi.nih.gov/health/dci/Diseases/stroke/stroke_treatm ents.html. Plaintiff's CT scan was negative for hemorrhaging.  SL 0154.

**C.   Plaintiff's Claim for Disbility Benefits**

On or around January 22, 2006, Plaintiff submitted a claim to Defendant for Long Term Disability benefits.   SL 0103-0117. Plaintiff's claim was denied on April 26, 2006, based on a review of the medical file and a telephone interview with Plaintiff conducted by Senior Benefit Analyst Jacqueline Heintz, who has no medical training or qualifications.   SL 0246-0249.   The denial letter notes that Plaintiff's file was "referred to our medical department for review;" however, the record indicates that only a registered nurse, Ms. Loretta Dionne, reviewed the file.[4]   Nurse Dionne's review acknowledges much of the medical evidence supporting Plaintiff's stroke and resulting swallowing difficulties, decreased strength and numbness in the right hand and leg, lack of temperature sensation in the right arm and leg, and vertigo.   But remarkably, her sole conclusion after her review of the medical record is that Plaintiff had high blood pressure which in her view "began to normalize around 1/24/2006."[5]   SL 0063. Based on Nurse Dionne's opinion and Ms. Heintz's assessment, Plaintiff received disability benefits only for the period of

---

[4]

At no time in the claims or appeals process did Defendant direct Plaintiff to undergo an independent examination by a doctor selected by Defendant.   Defendant's consulting medical professionals only reviewed the paper file and never personally examined Plaintiff.

[5]

Plaintiff's blood pressure on this date was 150/100, which is not normal. SL 0143.

November 21, 2005, through January 24, 2006, in the amount of $197.01.  SL 0248.

On April 26, 2006, also based on Nurse Dionne's report, Defendant determined that Plaintiff was ineligible for a waiver of premium benefits under his group life insurance policy, because he was not deemed "Totally Disabled" as defined by the policy.  SL 0251.

Plaintiff appealed Defendant's decision to deny long term disability benefits and a waiver of group life premium benefits on May 4, 2006.  SL 0056.  Defendant then contracted with Dr. Burt W. Hall, in internal medicine specialist, to review Plaintiff's claims for benefits.  Dr. Hall submitted his medical opinion, based on his review of the record, in a letter dated July 25, 2006.  SL 0041.

Dr. Hall's five-page letter reviews the medical evidence and provides conclusions that are different from those presented by Plaintiff's treating physicians.  First, it is apparent that, despite Dr. Davis and Dr. Khaleel's opinions to the contrary, Dr. Hall disputes that Plaintiff had a stroke in August 2005.  Dr. Hall notes that he reviewed the hospital records, imaging studies and laboratory tests, and follow-up reports from Plaintiff's doctors. *Id.*  Yet, Dr. Hall states, "it is not entirely clear to this reviewer how the diagnosis of CVA [stroke] was established insofar as imaging studies failed to reveal a new cerebrovascular accident."  *Id.*

10

Dr. Hall concedes that in the hospital Dr. Davis diagnosed Plaintiff with a CVA (stroke); however, Dr. Hall disputes this diagnosis and states: "there is no evidence based upon the imaging studies that were performed during the claimant's hospitalization that he actually had a new CVA." *Id.* Dr. Hall incorrectly states that the next six months of follow-up examinations with Dr. Davis "were primarily for evaluation and follow-up of the hypertension alone." SL 0042. Dr. Hall disregards Dr. Davis's notes on Plaintiff's right-sided weakness and dizziness and focuses instead on Dr. Davis's handwriting, which Dr. Hall complains is "most difficult to decipher." *Id.*

Dr. Hall observes that Dr. Khaleel "noted some decreased sensory modalities involving the right upper extremity" and Plaintiff's "[g]ait was noted to be somewhat unsteady due to some right lower extremity weakness." However, Dr. Hall summarizes that by September 28, 2005, "the neurological status was stable." *Id.*

Though Dr. Hall is not a neurologist and never examined Plaintiff, he opines that *if* Plaintiff did have a stroke, "it would have involved the left middle cerebral artery territory in order to give him right-sided symptoms." SL 0043. Dr. Hall cannot provide an explanation for Plaintiff's complaints of right-sided weakness, dizziness, and inability to grasp, climb, push, pull, balance, or crawl. Instead, Dr. Hall disregards the evidence of these symptoms and repeatedly states he is "unclear" as to why Plaintiff has such

11

limitations.   In Dr. Hall's opinion, Plaintiff has "no motor neurological deficit" and "no motor impairment involving the right side."  *Id.*  He concludes that Plaintiff should be capable of light work "based upon the lack of any documentation on imaging studies that the claimant, in fact, did have a CVA back in August 2005." *Id.*

Dr. Hall's opinion that: "neither Dr. Davis nor Dr. Khaleel has provided any findings on physical examination that there are any neurological deficits involving the right side" is clearly contrary to the evidence in the record.  He then concludes that "[e]ven at the time of the initial hospitalization, the only deficit that was found was some numbness involving the right side," which ignores the Plaintiff's doctors' observations and objective testing of Plaintiff's difficulties with swallowing, vertigo, weakness, and lack of temperature sensation on the right side of his body.  SL 0044.

Plaintiff's consistent complaints about episodic vertigo and disequilibrium, which has been confirmed on follow-up examinations by Dr. Davis, are seemingly ignored by Dr. Hall.  Dr. Hall apparently thinks that since "[g]enerally, strokes that involve the left hemisphere are not usually associated with recurrent vertigo and disequilibrium," this means that Plaintiff's complaints of vertigo are a fiction.  *Id.*  Dr. Davis describes Plaintiff's disequilibrium since the stroke as "recurrent" and that Plaintiff

12

"has actually had some episodes of falling since the stroke." SL 0051. Yet Dr. Hall summarily finds "no basis...for the restrictions and limitations imposed by Dr. Davis." SL 0044.

Dr. Khaleel's observations of "diminished sensory modalities in a glove-like distribution involving the right upper extremity" are dismissed by Dr. Hall as "difficult to explain," as are "the claimant's ongoing complaints of right-sided weakness." *Id.* Dr. Hall states wrongly that "[t]here certainly was not any evidence of right-sided weakness other than numbness on initial presentation back in August and certainly not during follow-up evaluations by Dr. Khaleel," when the evidence from Dr. Khaleel's notes in August 2005 and in follow-up examinations shows Plaintiff exhibited unsteady gait, difficulty balancing, and lack of sensation in his right hand. Regarding Dr. Davis's view that Plaintiff is unable to walk more than "approximately 200 feet," (SL 0051) Dr. Hall states, "[i]t is not clear where this significant weakness of the lower extremities is actually coming from" but concludes decisively that Plaintiff "does not have any neurological motor deficits as a result of his TIA [mini-stroke] that occurred on 8/23/05." SL 0045.

In summary, Dr. Hall's medical expertise in the area of strokes leads him to conclude that "at best...the claimant suffered a TIA, which was probably brought on by a hypertensive crisis," (*Id.*) even though the medical evidence indicates no rupture or

13

hemorrhage in the brain due to hypertensive crisis, but rather a lacunar infarct due to blockage in one of the brain's arteries. SL 0154. In the last paragraph of Dr. Hall's opinion, he does concede that perhaps Plaintiff suffered a mini-stroke, but that "[mini-strokes] by definition resolve spontaneously and completely within a couple of days." SL 0045. Therefore, because Plaintiff's symptoms *should have* resolved due to the limitations imposed by Dr. Hall's own diagnosis, Dr. Hall claims they *must have* resolved in fact, and therefore "claimant really has not had any change in his functionality from September 2005 through the present time." *Id.*

### D.   **Plaintiff's Mental Health**

Because some of Plaintiff's medical records indicated that he had complained of and taken medication for anxiety and depression, Defendant sent Plaintiff's file to Dr. Ronald Pies, a psychiatrist, for review. SL 0340-0341. Although Dr. Pies noted that Plaintiff suffered from a number of underlying medical conditions that could predispose him to depression, there was "rather meager documentation of any significant depressive symptoms in the record as a whole, for the index period of 8/05 to the present." No comprehensive mental status examination was conducted by any of Plaintiff's doctors, nor was Plaintiff ever seen by a psychiatrist. Dr. Khaleel observed that Plaintiff had "decreased energy, lack of motivation and signs of depression," which Dr. Khaleel treated with the drug Paxil. SL 0025. Dr. Davis found that Plaintiff had

"recurrent difficulties with depression with associated symptoms of insomnia, anxiety, and melancholy," which "caused withdrawal and extreme inability to handle stress."  SL 0051.

While Dr. Pies noted that the medical records showed Plaintiff may have suffered from depression as early as December 2005, "it is not possible to determine if the degree of depression reaches the level of an incapacitating psychiatric disorder" or whether it was continuous from December 2005 through June 2006 based on the information in the file.  SL 0341.

### E.  Plaintiff's Vision Problems

Plaintiff also submitted notes from his ophthalmologist, Dr. Parnell, dated January 18, 2006 (SL 0255), showing that Plaintiff had a cataract; however, Plaintiff failed to provide further medical support for any eye problems post-dating his stroke or otherwise caused by his stroke.  The rest of Dr. Parnell's medical reports pre-date the August 2005 stroke, and thus may describe pre-existing, disqualified conditions.  SL 0277-0282.  Moreover, Dr. Parnell did not comment on whether Plaintiff's eye condition would affect his ability to work.

Dr. Khaleel noted in a September 1, 2006, letter that Plaintiff saw Dr. Ivory Kinslow for "an isolated left fifth nerve palsy, Keratitis Sicca in the left eye and minimal cataracts in both eyes."  SL 0025.  However, there are no medical reports in the record from Dr. Kinslow.

15

## II. Standard of Review

A denial of benefits claim under ERISA is reviewed for an abuse of discretion when "a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations." *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 1997)(en banc)(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). If a plan confers discretionary authority, then the Court must defer to the determination made by the administrator or fiduciary unless such determination is arbitrary and capricious. *Firestone*, 489 U.S. 115. "[R]eview for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference" because the terms are generally interchangeable. *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008), citing *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 946 n.4 (8th Cir. 2000).

The parties agree that abuse of discretion is the proper standard of review in this case. Therefore, the decision of the administrator may only be overturned if it was not "reasonable, i.e., supported by substantial evidence." *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996). The administrator's decision will be deemed reasonable if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. *Id.* If the

16

decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, (8thCCir. 1997), citing *Donaho*, 74 F.3d at 899.

The Court must examine the basis behind the administrator's decision in order to determine if it is supported by substantial evidence.   The evidence must be assessed by its quantity and quality, and this review, "though deferential, is not tantamount to rubber-stamping the result." *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).

There are five factors the Court must analyze in order to determine whether an administrator's decision was reasonable:

(1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Id.*, citing *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002).

In addition to analyzing these five factors, the Court must

17

also consider that a conflict of interest may exist in this case, as Defendant both determines whether an enrollee is eligible for benefits and also pays the benefits out of its own pocket. Plaintiff contends the conflict of interest should be considered as a factor in determining whether there was an abuse of discretion. *See Hackett v. Standard Ins. Co.*, 559 F.3d 825, 830 (8th Cir. 2009)(citing *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008)). The Supreme Court has stated that a reviewing court is to give importance to this conflict of interest depending upon how closely the other factors are balanced. *Glenn*, 128 S. Ct. at 2351. Accordingly, the Court will review the denial of benefits for an abuse of discretion, taking into account relevant factors to include the potential conflict of interest.[6]

## III. Discussion

In determining whether Defendant's denial of benefits was reasonable and supported by substantial evidence, the Court must review the quantity and quality of the medical evidence provided in the administrative record, as well as the relevant provisions of

---

[6]    The Court's will not give deference to the Social Security Administration's decision to award Plaintiff disability benefits. ERISA determinations of disability benefits are not subject to the same requirements as Social Security disability determinations. *Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 798 (8th Cir. 2002), citing *Ciulla v. Usable Life*, 864 F.Supp. 883, 888 (W.D.Ark. 1994)("ERISA plans are not bound by Social Security determinations, and this court owes no deference to findings made under the Social Security Act.").

the benefit plan ("Plan").  The Court will apply the deferential standard and the five-factor test of reasonability to determine whether there was an abuse of discretion.  *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002)

**A.   <u>The Plan</u>**

The Plan states that a participant is eligible for disability benefits if he is "Totally...Disabled due to an Injury or Sickness; and under the regular and continuing care of a Physician that provides appropriate treatment and regular examination and testing in accordance with your disabling condition."  SL 0356.  Under the Plan, a claimant is "Totally Disabled" due to "Injury or Sickness" if during the elimination period and the next 24 months a claimant is "unable to perform the Material and Substantial Duties of [his] Own Occupation."  SL 0469.  The term "Own Occupation" is "the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began."  SL 0468.  To receive long term benefits longer than 24 months, an employee must be disabled from "any Gainful Occupation" in order to continue to receive benefits.  *Id.* A "Gainful Occupation" is "employment that is or can be expected to provide an Employee with an income of at least 60% of his Indexed Total Monthly Earnings."  SL 0466.  If an employee is disabled under the Plan before the age of 60, as is the case here, the

19

employee's life insurance premiums are waived.  SL 0509.

   **B.   Five-Factor Test of Reasonability**

   Defendant determined that Plaintiff was not entitled to disability benefits except for the period of November 21, 2005 through January 24, 2006, which is approximately a two-month period.  SL 0248.  The Plaintiff's stroke and hospitalization, which led to his persistent symptoms of right-sided numbness and weakness, vertigo, and difficulty walking, among other problems, began in August 2005.  SL 0145-0151.

   Under the Eighth Circuit's holding in *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002), the first factor to consider in evaluating the reasonability of a Plan administrator's denial of ERISA benefits is whether the administrator's interpretation is consistent with the goals of the Plan.  The Plan's goal or intent is to provide disability benefits to an employee who is "Totally...Disabled due to an Injury or Sickness; and under the regular and continuing care of a Physician that provides appropriate treatment and regular examination and testing in accordance with your disabling condition."  SL 0356.

   Here, the administrator's decision to deny Plaintiff benefits was inconsistent with the goals of the Plan.  Plaintiff's hospital records, objective tests, and follow-up examinations by his treating primary doctor, Dr. Davis, and his neurologist, Dr. Khaleel, demonstrate that Plaintiff suffered a stroke in August

20

2005 and continued to suffer multiple disabling symptoms related to that incident for the following months.  There is no evidence in the record to support the opinion of Dr. Hall, Defendant's reviewing doctor, that Plaintiff did not suffer a stroke. Moreover, there is no evidence to support Dr. Hall's assertion that the only medical issue that Plaintiff's doctors monitored in follow-up examinations was Plaintiff's high blood pressure.  On the contrary, there is evidence in the form of both objective testing and subjective evaluation, documented by two treating physicians over a period of months, that Plaintiff's stroke caused him right-sided weakness, dizziness, numbness in the right hand, inability to balance, inability to walk for great distances, and inability to operate machinery.

Even assuming Dr. Hall is correct and Plaintiff did not suffer a stroke, the medical evidence is overwhelming that Plaintiff was disabled after his hospitalization in August of 2005. Defendant abused its discretion in relying on Dr. Hall's opinion as reviewing physician that Plaintiff's sole disabling condition post-August 2005 was hypertension.  Regardless of the cause of Plaintiff's impairments, the fact that he is actually impaired is obvious in light of the medical evidence in the record.

The second factor in assessing the reasonability of Defendant's decision is whether the interpretation renders any language in the Plan meaningless or internally inconsistent.

21

*Shelton*, 285 F.3d at 643.  Since the medical evidence only supports a determination that Plaintiff has episodic vertigo, trouble balancing, right-sided weakness, and numbness in his right hand, Defendant had the obligation under the Plan to assess whether or not Plaintiff could perform "the Material and Substantial Duties of [his] Own Occupation."  SL 0469.

Defendant's occupation at the time of disability onset was Chemical Facility Maintenance Supervisor.  Plaintiff's job description was provided to Defendant at SL 0100-0102.  The job is generally a hands-on maintenance position with supervisory functions.  Some of the supervisory tasks listed in the written job description are: "order parts and materials as necessary for repairs; coordinate repairs to limit excessive down time and overtime;" and "plan and issue work schedules to ensure continual safe and efficient operation of the plant."  *Id.*  But the non-supervisory, essentially maintenance tasks, are varied and obviously not sedentary in nature.  Some of these hands-on tasks are:  "provide or coordinate Maintenance Technician training including formal training, on the job training, and feedback through performance reviews and disciplinary actions; respond to job call back after working hours and/or on weekends and holidays; inspect completed jobs for quality assurance; respond to unplanned operational or maintenance events; direct the daily work activity for maintenance needs on a plant-wide basis" and "diagnose

22

operational problems and recommend corrective action." *Id.*

Under the "Required Knowledge, Skills and Abilities" section of Plaintiff's job description, a person employed in maintenance like Plaintiff is required to know how to operate tools and equipment used at the plant, work with chemicals, travel across "rough, uneven, or rocky surfaces" at the facility, and "be physically capable of operating the vehicles safely." All of these are non-sedentary tasks. *Id.*

Defendant abused its discretion in failing to perform any meaningful assessment of Plaintiff's job functions in light of his medical complaints. The denial of benefits letter Plaintiff received from Defendant wrongly stated that "[t]here is no documentation to support the extent of weakness in your extremities or problems with dizziness." SL 0248. There was no discussion in the letter about Plaintiff's job description or analysis of whether his medical restrictions would impact his ability to perform any aspect of his job.

Nurse Loretta Dionne, who initially reviewed Plaintiff's medical records for Defendant made no mention of Plaintiff's job description and did not analyze the medical evidence presented in light of Plaintiff's occupation. SL 0062-0063. She notes that Plaintiff is "capable of sedentary activities," yet does not explain how Plaintiff's occupation was a sedentary one. Strikingly, Nurse Dionne copies word-for-word in her report the

medical notes in the file from Dr. Davis and Dr. Khaleel, detailing Plaintiff's "decreased strength with numbness in right hand and leg" and "dizziness;" yet she concludes, contrary to the medical evidence transcribed in her own report, that "[t]he above limitations and restrictions are not supported by the medical documentation." She does not elaborate further to support her conclusion. *Id.*

Dr. Burt Hall, who examined Plaintiff's non-psychiatric medical claims, demonstrates a predisposition to find against the Plaintiff.  This is a factor that weighs in favor of the Court finding a conflict of interest, where as here, "circumstances suggest a higher likelihood that it affected the benefits decision..." *Glenn*, 128 S.Ct. at 2351.  Throughout his written opinion, Dr. Hall alternates between conceding that Plaintiff's treating physicians produced medical evidence substantiating his physical problems after the August 2005 stroke, and either disagreeing that the problems actually existed or disagreeing about the root cause of the problems.  Dr. Hall's stubborn adherence to his conclusion that Plaintiff is perfectly fine is mystifying, even to Dr. Hall, who qualifies many of his unsubstantiated conclusions with the words "it is difficult to explain..." or "it is not clear..." SL 0043.

Dr. Hall states: "[i]t is also not clear why the claimant is not able to drive, as the neurological examination has shown no

24

motor impairment involving the right side and, at best, shows a mild sensory impairment." SL 0043. But later on in the opinion, Dr. Hall records that Plaintiff's neurologist, Dr. Khaleel, saw Plaintiff "for follow-up of his right-sided weakness" and did a physical examination on Plaintiff that revealed "decreased sensory modalities in a glove distribution in the right upper extremity." *Id.*

In examining the remaining three of the five factors announced in *Shelton*, this Court must assess the following in determining whether an abuse of discretion occurred: (1) whether the administrator's decision to deny benefits conflicts with the substantive or procedural requirements of the ERISA statute; (2) whether the administrator has interpreted the words at issue consistently; and (3) whether the administrator's interpretation is contrary to the clear language of the Plan. These factors can all be addressed by examining the meaning of the terms in the Plan's definitions section. *See* SL 0466-0469.

Dr. Hall assesses Plaintiff's ability to perform his "Occupation" without analyzing what is required for Plaintiff's Occupation. This is an abuse of discretion. Defendant did not hire an vocational expert to opine about Plaintiff's ability to do his job. Neither did Benefit Analyst Jacqueline Heintz discuss in her denial of benefits letter the physical demands of Plaintiff's maintenance job in relation to any of his treating physician's

observations of his medical condition.  Defendant, pursuant to its own Plan language, was required to assess whether Plaintiff could continue to do "the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began."  SL 0468.  Instead, Defendant relied on Dr. Hall, who minimized the medical evidence ("the only deficit that was found was some numbness involving the right side..." SL 0043), misstated the medical evidence ("it is not clear on what this restriction is based since the claimant has no motor neurological deficit to account for any impairment in use of the hands" *Id.*), and ignored the medical evidence ("Clearly, if the claimant did have a stroke as Dr. Davis claims, there would only be weakness in one extremity.  However, even that does not seem to be the case."  *Id.*).

Defendant correctly observes that insurance companies are not required to give more weight to the opinions of doctors who treat the patient, as opposed to those who merely review the patient's file.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  However, the Supreme Court's holding in *Black & Decker* does not mean that insurance companies and courts are forbidden from giving more weight to treating doctors' opinions rather than the opinions of doctors who review the record alone.  *See Jobe v. Medical Life Ins. Co.*, 2010 WL 3732227 (W.D. Mo. Sept. 17, 2010) at

26

\*7.    The Court in *Black & Decker* expressly stated: "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker*, 538 U.S. at 834.

In the instant case, Plaintiff's treating physicians, Dr. Davis and Dr. Khaleel, documented Plaintiff's physical disabilities over a period of follow-up examinations for the duration of nearly a year.  Defendant's reviewing physician, Dr. Hall, evidenced bias in conducting his review in that he disregarded evidence, minimized evidence, substituted his own unfounded conclusions for those of Plaintiff's treating physicians, and failed to assess Plaintiff's occupational demands in light of the medical evidence.  It is reasonable for an administrator to deny benefits based on a lack of objective evidence.  *Coker*, 281 F.3d at 799.  But here, we have overwhelming evidence, including objective evidence, that Plaintiff is disabled.

To receive long term benefits longer than 24 months, an employee must be disabled from "any Gainful Occupation." SL 0466.  "Gainful Occupation" is "employment that is or can be expected to provide an Employee with an income of at least 60% of his Indexed Total Monthly Earnings."  SL 0466.  Defendant failed to undertake even the most cursory of assessments regarding whether Plaintiff could perform any Gainful Employment in light of the uncontroverted evidence of his physical limitations since August 2005.  It is not

appropriate to conclude that Plaintiff's job is merely sedentary. The evidence in the record supports Plaintiff's treating physicians' opinion that Plaintiff suffers from a Class 4 Physical Impairment, which according to the Plan is "moderate limitation of functional capacity capable of clerical/administrative (sedentary) activity." SL 0115. According to the plain language of Plaintiff's job description, the tasks involved in being a maintenance worker are physical in nature, though there are some clerical tasks involved in being the maintenance supervisor. SL 0100-0102. Accordingly, it is the opinion of the Court that Defendant's denial of disability benefits in this case based on Plaintiff's physical complaints was not reasonable and was not supported by substantial evidence.[7] Since Plaintiff became disabled before the age of 60, according to the Plan, Plaintiff is

---

[7]

    Regarding Plaintiff's mental impairment and vision claims, Defendant's decision to deny benefits based on these impairments is reasonable and supported by substantial evidence. It is noted that Plaintiff failed to submit a medical evaluation for his mental health problems from a qualified psychiatrist. Moreover, Plaintiff failed to submit medical documentation regarding any eye impairment except for cataracts. In reviewing the record, the Court finds that Defendant's determination that Plaintiff's mental impairment and eye impairment did not qualify for disability benefits is affirmed. However, it is the judgment of the Court that Plaintiff is entitled to receive long term disability benefits due to his demonstrated physical impairments proceeding from the August 2005 stroke, including episodic vertigo, trouble balancing, inability to walk more than 200 feet, right-sided weakness, and right-hand numbness. Defendant abused its discretion in denying Plaintiff benefits based on these physical disabilities.

entitled to have life insurance premiums waived.  *See* SL 0509.

C.  **Attorney's Fees**

Plaintiff has made a claim for reasonable attorney's fees and costs.  In determining whether to award attorney's fees in an ERISA case, the Court will utilize the five-factor test that the Eighth Circuit announced in *Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8thC Cir. 1984)(per curiam).  They are: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal [question] regarding ERISA itself; and (5) the relative merits of the parties' positions.

Defendant relied on the opinions of a nurse and a doctor in deciding to deny benefits.  Neither the nurse nor the doctor examined Plaintiff, but instead reviewed the medical evidence supplied by two treating physicians over a span of nearly a year. The medical evidence also included objective testing, including a CT scan, two MRIs, an MRA, a swallowing test, and other tests. Defendant's reviewing physician, Dr. Hall, littered his opinion with misstatements and grossly mis-characterized the medical evidence, to the Plaintiff's detriment.  It is difficult to read

29

Dr. Hall's opinion without considering that he intended to deny benefits to the Plaintiff regardless of what the medical evidence showed.

In light of these facts evidencing Defendant's lack of care and rigor in its claims review process, and its total reliance on Dr. Hall's opinion, the Court finds that the first, third, and fifth *Westerhaus* factors have been met. The Court finds that Defendant is an insurance company that has the ability to pay Plaintiff's attorney's fees, so the second factor is also met. As for the fourth factor, this favors Defendant, as Plaintiff's suit will only benefit his own application for benefits. Nevertheless, in considering the weight of the other four factors that have been met, and considering that the five factors "are by no means exclusive or to be mechanically applied," *Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 972 (8th Cir. 2002), the Court finds that Plaintiff is entitled to attorney's fees and costs in this matter.

## IV. Conclusion

Plaintiff's claim for long-term disability benefits due to physical impairment is **GRANTED.** Plaintiff's claim for a waiver of premiums on life insurance benefits due to his total disability is also **GRANTED.**

Defendant is ordered to pay Plaintiff benefits as of the date his benefits were wrongfully terminated, January 24, 2006, less any

offset for Social Security Disability payments received, up until the date of judgment.  Thereafter, Defendant is to pay Plaintiff disability benefits monthly, less an offset for Social Security Disability payments.

Defendant is further ordered to pay Plaintiff's life insurance premiums from January 24, 2006, until Plaintiff's death, according to the Plan's requirements.

Plaintiff's request that Defendant pay his reasonable attorney's fees and costs is also **GRANTED**.  Plaintiff's attorney is directed to submit a petition for fees and costs to the Court within fourteen (14) days from the date of this Order.  Defendant shall have fourteen (14) days thereafter to file a response.

IT IS SO ORDERED this 16th day of June, 2011.


/s/ Robert T. Dawson
HONORABLE ROBERT T. DAWSON
UNITED STATES DISTRICT JUDGE

31